Good morning. The next case on the call of the docket this morning is Agenda Number 7, Case Number 1, 2, 5, 4, 4, 3, Medponics Illinois LLC, Appellant v. Illinois Department of Agriculture. This case, the appellee will be dividing your time. You'll have to watch that. So first up is the appellant, Melissa Alina Murphy-Petros. Good morning, Your Honors, and may it please the Court. Melissa Murphy-Petros on behalf of the Plaintiff Appellant, Medponics LLC. The department's interpretation of the rule defining an area zoned exclusively for residential use is clearly erroneous for two specific reasons. First, the department's interpretation of the rule impermissibly restricts the scope of the statute's location requirement for medical cannabis cultivation centers. Under the department's interpretation, the phrase exclusively residential, in their view, does not encompass or apply to areas which are zoned exclusively for residential use, but allows special use permits. I think it's a very safe presumption that of all the municipalities across the state, many areas that are zoned exclusively residential under the applicable zoning ordinance allow special use permits that does not change their zoning designation or their zoning map. So the way the department is interpreting its rule is restricting the application of the act's location requirement so that it only applies in areas zoned exclusively residential, but with no special use permits allowed. And certainly there's nothing in the statute that indicates that the statute is not to apply statewide. The second problem with the department's interpretation is that it treats special use permits effectively as zoning amendments. And it's well established and long established, and we cited numerous cases in our brief on this point, that special use permits are not zoning amendments. They are what they say they are. They allow special use within a zoning district. They don't change the zoning district or the zoning designation. They don't change the zoning map. And this is important because, you know, people are entitled to rely on their zoning ordinances. If, for example, I purchased a home in Aurora's R1 district, which the statute – I'm sorry, the ordinance says is zoned exclusively residential, I'm entitled to rely on that zoning designation and not wind up, you know, perhaps years later, living half a mile from a medical cannabis cultivation center because the department says under its rule that where I live is not zoned exclusively residential after all. The department's interpretation by bringing in the – excuse me – the special use permits is effectively, again, treating those as a zoning amendment, so that areas which are zoned exclusively residential here in Aurora's R1 and R5 districts are, in fact, under their interpretation, not exclusively residential at all. And that certainly has no basis in the law and is clearly erroneous. Roberts. Counsel? Yes. What about deference? Address the deference issue to the department. Yes. Certainly, deference is the general rule, but it doesn't apply always, and it doesn't apply here. The court is to give deference to the agency's determination when, A, the statute is ambiguous and the department's interpretation of the statute is not clearly erroneous. Here, as we discussed in our briefs, the statute's location requirement for cultivation centers is not ambiguous. It states that they are not to be located within 2,500 feet of an area zoned for residential use. I mean, the only logical reasoning – reading, excuse me – of that phrase is that the legislature did not want cultivation centers closer than 2,500 feet away from where people live. That's not ambiguous. So there should be no deference. Even if an argument could be made that that was ambiguous, again, as I was just arguing and as we set out in our briefs, the department's interpretation of its rule is clearly erroneous in that it's carving out this special use permit aspect. There's a – the department uses the word exclusively, and this wasn't exclusively. It wasn't the residential designation. It wasn't exclusively. The R1 and R5 zoning districts are exclusively residential under the Aurora Zoning Ordinance, and that's made very clear, I think, in the language of the ordinance itself. The purpose of the ordinance states that it is to divide the city into distinct zoning use districts, among them residential. The R1 and R5 districts are zoned residential. They are zoned for one-family and multifamily dwellings, respectively. The ordinance defines residential area as areas to be used exclusively for residential use. The ordinance defines dwelling as buildings to be used exclusively – that word keeps coming up – for residential use. What I'm asking about is it appears that there were many permitted non-residential uses in that designation. Yes, it's zoned exclusively residential, and special use permits for non-residential uses are allowed. That does not change the zoning designation of R1 and R5. And because the statute and the rule both use the phrase zoned for, that's a full stop. We look at what the zoning ordinance says. It says exclusively residential. That's it. The availability of special use permits does not change the designation. The definition of the word exclusively, as the department used it in its rule, does not change the zoning designation. And again, you know, the folks in the city of Aurora, I think, are very entitled to rely on what their zoning ordinance says and to have their expectations based accordingly, not on the department's unilateral interpretation of its rule that because special use permits are allowed, these areas are not exclusively residential, even though their ordinance says that they are. And finally on that point, I would also add that the zoning ordinance states that the purpose of residential districts is to protect residential areas. So because residential areas are exclusively residential, so too are the districts. I would simply add, unless the panel has additional questions, that there has been no waivers of our arguments here, as curative asserted in its briefs. We were the appellee below and raised this in response to the appellant's arguments, the argument with respect to the zoning, I'm sorry, the interpretation impermissibly restricting the scope of the statute. So that's not been waived. It's properly before this Court. The standard of review is de novo. The facts are undisputed. And unless, again, you have further questions. Counsel, you rely on this living word case. How does that affect the issues in this case? We rely on the living word case for the definition and explanation of what special use permits are and how special use permits do not change zoning maps or districts. And they don't change zoning designations under an ordinance. So that's the purpose of our reliance, because, again, our view is that when the department is interpreting its rule as exclusively residential means exclusively residential but no special use permits allowed, you know, they're effectively treating special use permits as an amendment to the Aurora Zoning Ordinance so that R1 and R5 are not zoned exclusively residential after all. Again, despite that the statute or, I'm sorry, the ordinance says that they are. And, Counsel, back to the deference issue. Basically, your argument is that the department's ruling was unreasonable. That is the standard, isn't it, whether or not their interpretation was reasonable or not? Yes. And in our view, their interpretation is unreasonable for the reasons that we've been discussing here today. Are there any exclusive municipalities for the residential districts in Illinois? Because I know some municipalities have residential districts, but they also provide special uses, like as in this case. So are there any ones that are really totally exclusive? I can tell you that, according to, I looked this up the other day, under the U.S. Census for 2010, the last report we have, there are 1,299 municipalities in the state of Illinois. So we did not conduct an exhaustive research of every ordinance in every of those cities, towns, and villages. Curative has pointed out that the village of North Barrington, in its zoning ordinance, does not allow special use permits in a residential area. So, but again, that goes to the point about restricting where this location center requirement is to apply. Under the department's interpretation, it applies in the village of North Barrington, but it doesn't apply in the city of Aurora. And I think it's a very safe presumption that of those nearly 1,300 municipalities, Aurora is not the only one that allows special use permits in exclusively residential areas. Unless the panel has further questions? Okay, I will save my time. Thank you. Thank you, Mr. Petros. So, Mr. Moran. Thank you, Your Honor. Bill Moran on behalf of Curative Health Cultivation, LLC, the successful applicant for the cultivation center permit in Illinois State Police District Number 2. In this instance, we're looking at the Department of Agriculture's interpretation of its own regulation concerning an area zoned exclusively for residential use. If you look at the statute, the statute says 2,500 feet from an area zoned for residential use, but there is no definition whatsoever of what that term residential use means. Pursuant to the authority in the statute to promulgate rules related to its duties, under the statute, the Department of Agriculture promulgated this rule that states an area zoned exclusively for residential use. In this instance, this case has an unusual subject matter. I'm sure a lot of us never would have believed that we would be talking about marijuana on the legal side of the ledger while standing in this great courtroom. That being stated, we have to remember that this is really just a run-of-the-mill administrative review proceeding where deference is provided. Before the circuit court, the circuit court judge found that a mixed question of law and fact was presented, and that's how he decided the case. At the appellate level, the appellate court found that this was a question of law to decide, and that it would be a de novo standard. Even under a de novo standard, when you're operating with administrative review, there is deference that is provided to the agency's decision in the case, especially when it is interpreting its very own rule. As a result, in this case, to find that the decision was inappropriate, there has to be clearly evidence that that decision was erroneous, arbitrary, unreasonable, or inconsistent with past interpretations of that rule or statute. Here, we don't have any past interpretations. In other words, there has to be a firm conviction that what the department did in this situation was wrong. Looking at the facts on this record, we don't believe that the court can conclude that. In this deference, there is a presumption of validity of both the rule and the decision that's there. The appellant, in this case MedPonics, has the burden to show that that decision was inappropriate. If the decision of the agency is found to be defensible in any manner, that decision has to be affirmed. In this case, MedPonics keeps on talking about the R1 and R5 rules. And labels those as exclusively residential, just because of the name. In other words, what they're saying, if a municipality labels something R1 or R5, no matter what can be placed in that area, that's exclusively residential. We don't believe that that's the appropriate analysis in this case. We believe the appropriate analysis is to look at what the zoning requires. In this case, if you look at the Act and its legislative findings, the only purpose stated there is to help people, patients with debilitating medical issues, with medicine that can help them. There's nothing about zoning there. There is, though, another section where the legislature required that for one of these permits to be issued, that the local zoning board had to approve the location of that cultivation center at the place where the applicant was going to put the center. In this instance, if you look at what actually happened, the City of Aurora passed an ordinance that said, we are going to allow cultivation centers in our municipality, but we're only going to allow those in manufacturing districts, M1, M2 districts. They passed that ordinance, and then Curative, my client, filed its application for a special use permit, which is required under the ordinance, to place their cultivation center in an already existing industrial park. With other factories, manufacturers, warehouses, in this case, you have to understand what these cultivations are about, what they look like, because we could drive by one of them a hundred times and not know what they are. These are warehouses. There's no windows. There are no greenhouses where people can see the product. There are no air filtration systems to make sure that no noxious smells escape the premises. There's unbelievable security, 24-7 cameras that are required. You can't walk into one of these facilities unless you have a state-issued license or you have special permission from the department. No signs whatsoever about what's in that facility. The products are not loaded outside into trucks. There have to be enclosed bays where the products are transferred inside. Therefore, these facilities are as innocuous as possible. In this instance, with that knowledge, my client applied, and it's clear that the city of Aurora took this very seriously. The request for the special use in this case was published. There was a public hearing. There was a planning commission proceeding where it recommended that this be approved. That went to a city council where, again, it was published. There was public debate about this, and the city council voted 9-3. In this instance, the statute worked exactly as it was designed, and that is to make sure that the product is approved, which is to allow the people of the city of Aurora to decide what went into their community and how it went into the community. As far as the R1 and R5 districts, the appellate court called it a litany of different things that were allowed, but literally in these districts there can be airports, train stations, wastewater treatment facilities, hospitals, universities, trade schools, social service agencies, all in this area. It was clear that Aurora looked at that and said, these two things can coexist. In fact, in the ordinance that allowed the special use, there was a special finding made that the proposed special use will not be detrimental to or endanger the public health, safety, morals, comfort, or general welfare, and will not be injurious to the public health, safety, morals, comfort, or general welfare, and will not be injurious to the use of other property in the immediate facility, nor diminish or impair property values in the neighborhood. In this instance, that is a defensible position that was presented to the Department of Agriculture with the deference that's applied to these decisions. That has to be affirmed here before this court, and we would request that that be the decision that the district be affirmed in its entirety. Good morning, Your Honors. May it please the Court. Assistant Attorney General Bridget D. Batista, on behalf of Appalachia's Illinois Department of Agriculture, its Director, and its Bureau Chief of Medicinal Plants. Your Honors, we ask that the Court affirm the decision of the appellate court upholding the determination of the Department for two main reasons. First, the Department's interpretation of its regulation that an area, quote, zoned exclusively for medical use, does not include areas also zoned for non-residential uses, affords the regulation its plain meaning, and therefore should be upheld. Second, MedPonics has, at most, proffered an alternative construction of the regulation, but it has not shown that the Department's interpretation is unreasonable. As such, for this additional reason, the Department's interpretation is that an area no longer is zoned exclusively for residential use when it permits non-residential uses. This reading affords the language its plain meaning. Under the plain meaning approach, a court gives effect to every term and renders none superfluous. Here, the Department's interpretation gives effect to the term exclusively, which, as the appellate court concluded, means solely, only, to the exclusion of all others. The R1 and R5 districts, although zoned as residential districts, are not zoned to the exclusion of all other uses solely or only for residential use. Rather, they permit non-residential uses. They are, therefore, not zoned exclusively for residential use. Sotomayor, your opponent has argued that the interpretation really equates a special use permit with a zoning amendment. Your Honor, that is incorrect. We understand that that is the argument that is being made. However, the Department has never argued that the R1 and R5 districts are, has never disputed that they are zoned over-arsenally as residential districts. Its position is that, however, once other uses outside of residential uses are permitted, it is no longer zoned exclusively for residential use. So, yes, R1 and R5 are residential districts, but they are not exclusively zoned for residential use once those non-residential uses are permitted. Medponex also argues that the setback requirement, and indeed its main argument, is that the setback requirement should apply whenever an area is zoned as a residential district. But this reading runs afoul of the plain meaning approach by rendering part of the regulation superfluous. Specifically, when we look to the second sentence of the provision we're looking at here of the regulation, it already addresses a situation where it is sufficient for an area to be zoned as a residential district for the setback requirement to be triggered. And that's where the population exceeds 2 million people. In the case that the setback requirement is automatically triggered when an area is zoned as a residential district, there would be no need for this second sentence. As such, this reading by Medponex, which renders that sentence superfluous, should not be adopted by this Court. Second, even if the Court were to deem Medponex's interpretation reasonable, which, for the reasons already stated, it should not, Medponex has only offered an alternative interpretation. Medponex will defer to an agency's interpretation of its own regulation and enabling statute unless the interpretation is unreasonable. Medponex raises two arguments to assert the Department's interpretation is unreasonable, but neither should be adopted by this Court. First, Medponex asserts the Department is arguing that allowing non-residential uses changes the zoning designation of a district. As previously just discussed, the Department has never disputed that R1 and R5 are residential. It is simply that once they allow non-residential uses, they are no longer zoned exclusively for residential use. Second, Medponex argues that the setback requirement does not apply statewide. But its argument rests on a premise that if the existing facts in the municipality would not amount to a violation or triggering of the setback requirement, the law doesn't apply there. But it cites no authority for that premise, and the Department's interpretation is unreasonable. The Department is aware of none. Finally, excuse me, Medponex's remaining arguments should be rejected. Medponex argues that the residential district is equated to residential area in the City of Aurora Zoning Ordinance. When we look to the City of Aurora Zoning Ordinance, we see that a residential area is defined as a zoning lot or portion of a zoning lot designed or used exclusively for residential purposes. However, there is a distinct phrase, residential district, that is also used in the ordinance. And there's no indication that the term residential area in the ordinance is the same as residential district. And indeed, when we look to the definition of residential area as defined as a zoning lot or a portion of a zoning lot, we see that the City was referring to a narrow area, a particular zoning lot. And we cite in our brief in the supplemental appendix that the term zoning lot itself is a zoning lot. And it itself is defined in the City of Aurora Zoning Ordinance as a plot of ground. So again, it's a narrow plot zoning lot of ground, not an entire residential district. So this Court should not be persuaded by the definition of residential area, including this explanation of used exclusively for residential purposes, when it is shown that it is referring in that instance to a narrow area and not an overarching large residential district such as R1 and R5. And if the Court has no further questions, we would ask that it affirm the decision of the Appellate Court reversing the judgment of the Circuit Court, and thereby affirm the determination of the Department. Thank you.  I would like to start with the Department's final point that residential districts and residential areas are somehow different under the Aurora Zoning Ordinance. They simply are not. And this argument, in fact, I think is very illogical. By looking, if you follow the Department's reasoning, the residential area definition, which includes the phrase zoning lot, means that in the Aurora, we have individual lots zoned exclusively residential, scattered through the city, regardless of what use district they are in, whether they're in residential, business, parks, what have you. This is counter to the purpose of the Aurora Zoning Ordinance, which states specifically that it is to divide the city into particular zoning use districts, each with its unique characteristics and development. And it's also counter to the Ordinance's purpose of residential districts, which is to protect residential areas. If the only residential areas are these individual lots scattered across the city, I don't see how anyone can make a plausible argument that these residential districts like R1 and R5 are able to protect those. The logical reading is that residential districts are comprised of residential areas. Residential areas are zoned exclusively for residential use, and therefore apply the setback provision of the Act, and the rule applies. We have cited authority for our position that the Department's interpretation impermissibly restricts the scope of the location requirement. That is this Court's decision in Hadley v. Illinois Department of Correction, which we discussed at length in our opening brief, and which the Department did not address at all in its response. And Hadley certainly supports our position that any agency interpretation which restricts the scope of a statute is impermissible, clearly erroneous, and cannot stand. I think the final point I would like to make, barring any further questions, is that all of this comes back to the language of the Zoning Ordinance. Again, every one of us, whether we are individuals buying homes, we are businesses, schools, what have you, we are all entitled to rely on the Zoning Ordinance in our municipality and what that Zoning Ordinance says. Here, the Zoning Ordinance says specifically that R1 and R5 are exclusively residential. That's where we end. To allow the Department's interpretation to effectively change that zoning designation through its rule, through its interpretation, no public input from anyone who lives in the City of Aurora with respect to that, is a very dangerous precedent. Zoning Ordinances mean something. They mean something to all of us. And that's really the full stop. It's exclusively residential in R1 and R5. Curative's location is closer than 2,500 feet to those two districts, and therefore the permit award to curative was clearly erroneous, the Department's interpretation is clearly erroneous, and reversal is required. That's an interesting argument I hadn't thought of, and I wanted to follow through for a moment. You're saying that it's up to the municipality here, Aurora, to make its own best decision for its citizens, and it should not be up to the Department of Agriculture. Could the village, the municipality of Aurora, create a special use for a marijuana cultivation plant? Yes, it certainly can. But where those locations, I'm sorry, where that plant would be located would still have to comply with the Act's setback of 2,500 feet from a residential area, zone for, excuse me, a residential area, and the Department's rule of 2,500 feet away from an area zoned exclusively for residential use. So the fact that they're allowed to grant special use permits for these centers, I mean, that's fine, but you still do have to comply with the geographic location requirement. And that again is, you know, what the city of Aurora, and really I think all zoning ordinances go to in terms of people should be able to rely that if where I live it says zoned exclusively residential, that the department is not going to say, well, you know, not really, not wish to be in, so. Councilman, but they're special uses granted all the time. They are. Special uses, however, I think generally speaking, are going to be, first of all, consistent with the zoning district that they're in. I know there's a lot of talk about like airports and train stations and whatnot, but, you know, the reality is that zoning boards are looking for consistency. In a residential district, I think you will see a lot of parks and churches, schools, and so on, and so forth. Schools, libraries, things like that. The other, I think, thing that is different, though, is if there's a special use permit that's going to be granted, like in an R1 district in Aurora, there's going to be notice. There's going to be public hearings. People can come and speak their piece and say, yes, I want that. No, I don't want that here. Here's why. That's not what's happening here. Here the department is saying, this is our rule, this is the way we operate, and where you live is no longer exclusively residential anymore without any input from the folks on the ground who actually live there. So there was no input? I thought I heard an argument that there was input on a special use. There were hearings on the special use permit that was granted to curative. There is a footnote in our opening brief. We did try to supplement the record with information pertaining to the public comments at those hearings because he had already reached his final judgment. Judge Goose did not allow that motion. However, in the supplemental record, those materials are there. There were a lot of complaints. A lot of people in Aurora and a lot of people on the DuPage County Board were there, and they did not want curative's location or curative center where it was because it was less than 2,500 feet from residential areas. If there are no further questions, we request reversal. Thank you. Thank you. Case number 125443, Medponics, Illinois LLC v. Illinois, will be taken under advisement as agenda number seven. Thank you, Mr. Moran, Bridget DuFastista, and thank you, Ms. Murphy-Petros for your arguments this morning.